## Margaret Ann Babcock, Appellant, v. John V. Farwell et al., Appellees.

### Gen. No. 13,947.

1. JURISDICTION—*who estopped to question.* A party who has invoked the aid of a tribunal the jurisdiction of which is questioned by the other party, is estopped thereafter to attack such jurisdiction after the same has been assumed and the merits of the controversy determined.

2. FRAUD—*who may not ask relief upon ground of.* The right to relief upon grounds of fraud is personal and non-assignable.

3. CORPORATIONS—*of what stockholder may not complain.* A stockholder cannot complain of corporate acts done prior to his becoming a stockholder; this upon the theory that such acts do not affect such stockholder's rights, as he is presumed to have become a stockholder with knowledge of the conditions existing at the time of purchase.

4. CORPORATIONS—*when stockholders may not attack account.* If the accounts of a corporation have been audited and notice of such auditing given as provided by its by-laws, the same become ratified if objection thereto is not made within the time and in the manner provided for by such by-laws.

5. CORPORATIONS—*when directors may contract with.* There is neither impropriety nor violation of law in a director of a corporation entering into a contract with it, provided the corporation is represented by independent agents and the contract is otherwise without fraud.

6. CORPORATIONS—*who may be elected directors.* There is no legal barrier preventing a majority of stockholders from voting into the directory of a corporation such persons as they may see fit. They have the right to put into the management of property in which they have a controlling interest, persons who will, in their opinion, manage the corporation property so as best to conserve it and their own interests.

7. CORPORATIONS—*what essential to right of stockholder to sue in corporate behalf.* Before a stockholder may sue directors and officers in an action which the law requires to be instituted and maintained by the corporation, the refusal of the corporation to institute such an action must have been fraudulent in character.

8. CONTRACTS—*how rescission must be made.* A contract cannot be in part rescinded and in part kept alive; if it is sought to be rescinded prompt action is required; delay in the exercise of the right of rescission forecloses such right.

9. CONTRACTS—*what essential to rescission.* No rescission of a contract can be perfected without at least restoring the consideration parted with in virtue of its assumed validity and binding force.

10. CONTRACTS—*what not personal service.* Held, that the particular contract in question in this case was not strictly of a personal nature for personal service and did not terminate upon the death of the party obligated to render such service.

11. LACHES—*when bars relief in equity.* Long-continued delay in prosecuting supposed rights raises the presumption of purpose in delay and bars the right to relief.

12. LACHES—*when trust relation does not bar defense of.* A repudiated trust relation enables the interposition of the defense of laches.

13. STATUTE OF LIMITATIONS—*when applies as to trust relationship.* A repudiated trust relation renders the Statute of Limitations invokable by way of defense.

14. ACCORD AND SATISFACTION—*effect of.* A settlement agreement respecting litigation concludes the questions in controversy and the same is a bar to a subsequent action with respect to the matters compromised, unless a valid rescission is established.

Bill in chancery. Appeal from the Superior Court of Cook county; the Hon. GEORGE A. DUPUY, Judge, presiding. Heard in this court at the October term, 1907. Affirmed. Opinion filed January 18, 1909.

INTRODUCTORY.—This appeal is prosecuted in an effort to reverse a decree of the Superior Court sustaining general and special demurrers interposed by the several appellees to the bill of appellant as twice amended, and upon the election of appellant to stand by her amended bill as amended, dismissing the same for want of equity with a judgment for costs against appellant.

The matters involved in the bill so dismissed are of great magnitude, involved and intricate, and encompass a period of time exceeding a quarter of a century, during which all of the original actors, including those whose conduct and intentions are impugned and challenged, have gone to "the undiscovered country from whose bourn no traveller returns." The bill as twice amended is voluminous, covering 314 pages of the abstract. The briefs are lengthy and

exhaustive of the questions of fact and law discussed in them. The printed matter before us consists in round numbers of 1,300 pages. We mention these facts to emphasize the difficulty confronting us in effectually disposing of so bulky a cause within the reasonable limits of a judicial opinion. Indeed, in the conclusions to which we have arrived we do not deem it necessary or desirable to advert to all the varied matters appearing in the pleadings, or to discuss all the law or answer the whole of the argument projected into the cause by the briefs. We shall content ourselves in the statement which here follows by limiting it to such facts as are, in our opinion, sufficient to an adequate understanding of the cause and potent to our decision, and shall in our opinion touch only upon such legal questions conclusive, in our judgment, to determine the rights involved upon the facts so appearing.

**Statement by the Court.** The relationship of the parties, John V. Farwell, Charles B. Farwell, Abner Taylor and Amos C. Babcock, had their origin in an undertaking •to build a State House for the State of Texas at its capital city of Austin, as compensation for the building of which the State of Texas was to grant and convey three million acres of land situate in that part of the State of Texas colloquially known and designated as the "Pan Handle of Texas." The initiatory agreement in the transaction was evidenced by a contract made between Mathias Schnell with the State of Texas, through its Capitol Commissioners, dated January 18, 1882. This contract was subsequently assigned to both the Farwells, Taylor and Babcock, who thereafter, for convenience, assigned the same to Taylor. Taylor on June 20, 1882, made a contract with the State of Texas to do all the things contemplated to be done by the contract made between Schnell and the State of Texas for the considerations in that contract mentioned and in the Taylor

contract with the State of Texas reiterated. On December 4, 1882, the Farwells, Taylor and Babcock executed a written agreement, signed by all of them, in which it was recited that each of them was equally interested in the contract mentioned and made respectively between Taylor and Schnell with the State of Texas. It was further recited "that each and all of them are equally bound by the covenants and agreements in said contracts and accept the same as much as if they had each for himself signed said contracts, and that each are equally interested in the building of the Texas State House and the land received in payment for the same, each to receive his equal share of the profits and bear his part of the losses. All monies advanced by any of the parties to carry on said work is to draw interest at the rate of six (6) per cent, and such monies are to be paid out of the first monies received." In the event of the death of either of the parties, it was agreed that the survivors should carry out the contract to completion, and that no settlement should be made with the survivors of such deceased party until sixty days after the completion of the State House or the abandonment of the work under it, at which time full accounts should be rendered and a settlement made between the survivors and the representative of the deceased party.

On June 1, 1885, a tri-partite agreement was entered into between Abner Taylor of the first part, Charles B. Farwell and John V. Farwell of the second part, and "William Chase Prescott, as Manager for and as Trustee on behalf of The Capitol Freehold Land & Investment Company, Limited, a company in process of being organized and incorporated in England, by registration under the Companies Acts, 1862 to 1883, with a memorandum and Articles of Association (prints of which have been approved by the parties hereto of the first and second parts, before they respectively signed) with a capital of three million pounds, in three hundred thousand shares of ten

pounds each, and having its registered office in London, in the United Kingdom, hereinafter referred to as ''The Company' of the third part.''

The substantial portions of this agreement are that the parties of the first and second parts have represented to the Company that the contract of January 18, 1882, is vested in Abner Taylor, and that he and the Farwells were the only persons having any interest in that contract, or the profits thereof or the lands to be acquired thereunder ''(in particular that Amos Charles Babcock had no longer any interest)'', and that under that contract and their arrangements with the State of Texas, the Farwells and Taylor had sole possession of the whole of the lands subsequently described, and were then entitled to absolute conveyances of about four hundred and thirty-eight thousand seven hundred acres of such lands. It is then agreed *inter alia* that Taylor will sell and the Company will purchase the fee simple title to the tract of land containing not less than three million acres, granted by an Act of the Texas Legislature for the purpose of erecting a new State Capitol at the seat of Government of Texas, and described in a report dated November 15, 1880, made by Nimrod Lindsey Norton. a Commissioner appointed by the Governor of Texas; the purchase price to be one million nine hundred and ninety-nine thousand nine hundred and thirty pounds, to be used in payment of one hundred and ninety-nine thousand nine hundred and ninety-three shares of ten pounds each, as hereinafter mentioned, and six hundred thousand pounds in cash, or in first mortgage debentures of the Company, of such number and amounts to be thereafter determined, and subject to the condition that they are part of a total of proposed issue of one million pounds debentures, all ranking *pari-passu,* and bearing interest at five per cent. per annum. When the remaining four hundred thousand of the one million pounds debentures have been subscribed or issued for the purpose of stocking

the property, or as soon as the same is sufficiently stocked and the requisite improvements completed, even though the full four hundred thousand pounds may not have been issued, the Board of Directors shall take measures to issue the remaining six hundred thousand pounds of debentures and turn over the cash as received from the sale of such debentures to Taylor and the Farwells, until such issue has been completed; that Taylor and the Farwells may, at any time, and from time to time, demand any portion of the six hundred thousand pounds of debentures which may be unsubscribed for by the public, and have the same issued to them or their nominees, whereupon the Company shall be relieved *pro tanto* from any obligation to offer to or issue to the public any portion of debentures so received by Taylor and the Farwells; that Taylor will apply for and have allotted to him thirty-seven thousand four hundred and ninety-eight of the one hundred and ninety-nine thousand nine hundred and ninety-three of the ten-pound shares, and that the Farwells will likewise apply for and have allotted to them one hundred and twelve thousand four hundred and ninety-five of such shares, and that the remaining fifty thousand shares, or one-half of the debenture issue of one million pounds, shall remain unallotted in the hands of the Company, subject to certain conditions enumerated in the succeeding eighteen clauses of the agreement. Among these clauses appears the following:

By clause 5 the abstract of title shall be the book containing the report of the Capitol Building Commissioners to the Governor of Texas, with appendices dated January 1, 1883, in possession of the Company's solicitors. Taylor and the Farwells guaranteed the correctness of the book's contents, "and that there are no deeds or dealings with the contract of eighteenth of January, 1882, of the aforesaid lands, except those stated in it."

By clause 6 Taylor agrees to make conveyances of,

and the Farwells guarantee that Taylor will convey to the Company, not later than July 1, 1890, the whole of the land comprised in the three-million-acre grant.

By clause 7 the Farwells agree that as soon as the Company has accepted title to 438,000 acres of land they will transfer to the Company, "as agents thereof," without any deduction for profit, all stock already purchased and on hand, and also all other stock for which they may hold contracts. Until such transfer the Farwells agree "to make all payments and execute and do all things which are necessary to be made or done under said contracts by the purchaser thereunder, and will cause the cattle and stock to be grazed and taken care of on part of the aforesaid lands."

By clause 11 the Company agrees to apply the proceeds from the issue of debentures, not intended for payment to vendors for lands, "in fencing, constructing of buildings, water courses, ponds and wells, upon and otherwise equipping said land, for the purpose of carrying on the business of cattle ranching thereon, in carrying out the contracts mentioned in clause seven hereof, and stocking the same with cattle, horses, mules, and other live stock, and providing and doing all other things which, in their discretion, the Directors shall think necessary or expedient for the purposes of utilizing and developing the said property, and in the payment of all such salaries, fees, wages, and other expenses, and general purposes, as the Directors shall consider necessary," etc. The net profits, if any, of the Company, in each year, shall be applied first in the payment of interest and arrears, if any, on the debentures for the time being issued and outstanding, the balance by way of dividend, as prescribed by the articles of the Company.

By clause 12 Taylor and the Farwells agree, until the net profits of the Company are sufficient for that purpose, to pay the interest on the debentures outstanding, and before the complete conveyance of the

three million acres, they will contribute and pay to the Company a sum sufficient to make good any such deficiency of interest on such debentures, which sum the Company shall hold as Trustee and shall pay therewith such deficiency of interest on such debentures.

By clause 13 Taylor undertakes to, and the Farwells guarantee the Company that Taylor will, duly perform the contract and indemnify both the Company and the Trustees against all defaults thereunder, and from all claims, encumbrances and defects of title made by the State of Texas, or others, and to the full enjoyment and possession of the land; and the next succeeding clause provides for the repayment to Taylor and the Farwells of all monies advanced under the terms of this contract, with interest at five per cent., out of the net profits of the Company, before the payment of dividends, but otherwise shall not constitute a debt due from the Company.

By the 15th clause John V. Farwell was made the first managing director in this country for a term of not less than five years, in accord with Art. III of Section 17 of the Articles of Association. In the event of the death or disability of John V. Farwell, his successor was to be nominated by the American Director, subject to the approval of the Board. General management of the lands and property of the Company vested in the American Director, with power to appoint subordinates, make contracts of purchase and sale, etc.; subject always to the control and approval of the Board.

Clause 17 provides that the Board and such agents in the United States appointed by it, shall alone act for the Company in carrying out this agreement, and not the American Directors or Managing Director. Doubts and disputes arising as to the meaning of the agreement are, by the final clause, made solvable in England by arbitration, and that for the purpose of such

arbitration "this agreement may be made a rule of Her Majesty's High Court of Justice in England."

The Capitol Freehold Land & Investment Company, Limited, was chartered agreeably to the statutes of the British Parliament, in accord with the intent of the last recited agreement, and near the time it bears date, with a capital of three million pounds. The Articles of Association are lengthy, and with exactness and under many provisions and clauses set forth with much particularity the purposes of its formation and the rules which shall govern it, and the scope of the powers, duties and limitations of its officers and agents. However, its primary purpose and main business clearly appear from such articles to be the taking over of the Schnell contract and the erection thereunder of the Texas State capitol, the acquiring of the title to the three million acres of Texas land, and the raising and grazing, selling and trafficking in cattle on a very extensive scale, and to do and acquire all things necessary to be done and acquired in carrying out such purpose and in operating the extensive ranches contemplated by such articles of association. By the constitution of the Company the Farwells were both named as members of the first Board of Directors to continue as such Directors so long as they hold 25,000 registered shares of the Company, with power to appoint, in writing, any member of the Company owning fifty shares of stock, proxy to act for either of them while absent from England, agreeing to ratify the actions and doings of any person acting as proxy for either of them. John V. Farwell was also by said constitution appointed first managing director, as recited in clause 15 of the tri-partite agreement, *supra.*

It is averred that Babcock had no knowledge of the making of the tri-partite agreement until long subsequent to September 19, 1885, and that at the date thereof he owned a one-fourth interest in the Texas State House contract, made originally with Schnell.

On September 19, 1885, Babcock and the Farwells made an agreement in the following terms: after reciting that Babcock, November 12, 1884, put in trust in the name of Charles V. Farwell his interest in the contract to build the Texas State House, at that time in the name of Taylor, for the use of all parties in interest, and that he was indebted to the Farwells for money advanced him, and also to A. A. Burke for an interest in the Schnell contract, it was agreed that for the amount due the Farwells and for an additional sum of $25,000, one-half of Babcock's interest in the Schnell contract was transferred to the Farwells and Babcock discharged from his obligations to them, and that for any amount paid to Burke exceeding $1,500 for his interest in the contract, the excess shall be deducted from the $25,000, and the balance remaining, paid, either in cash at the end of six months, or in a note at six months, at the option of the Farwells. The Farwells paid Babcock about $40,000 for the said one-eighth interest. On the same day the Farwells executed and delivered to Babcock a declaration of trust as to his one-eighth interest in the Schnell contract, in which they agreed to account to him for one-eighth of the net profits made on said contract; also agreeing that such interest should extend to include the cattle business contemplated to be carried on upon the Texas land; that all interest paid by the contractor or the Farwells for building the State House or in the cattle business shall be deemed a part of the expense of the enterprise. Whatever shall be paid Burke in excess of $1,500 for his pretended interest in the Schnell contract, shall be refunded by Babcock. This declaration concludes with the following sentence: "It is understood that said Babcock shall not be required to furnish any money."

It is alleged that the Farwells and Taylor transferred to the Capitol Company all rights to the Texas land to be received under the Schnell contract for the consideration, part in stock and the balance in cash

or debentures of $12,884,000; that the total cost of the Capitol Building was not to exceed $3,200,000, and that at the time of such transfer not more than $500,000 had been actually expended toward the building of the capitol; that such transfer included the one-eighth interest of Babcock, for which the Farwells had paid but $40,000, which at the price received made that interest of the value of $1,465,500, which, after deducting certain charges proper to be made against said one-eighth interest, left a net profit of $742,233; that Taylor transferred all his interest in the premises to the Farwells, and that John V. Farwell and the estate of Charles B. Farwell wrongfully hold and claim the same, contrary to equity.

On August 21, 1885, without the knowledge of Babcock, the Farwells and Taylor entered into an agreement with the Capitol Company supplementary to that of June 1, 1885, in which that agreement was changed to permit of debentures provided for by the agreement of June 1, 1885, and the Articles of Association of the Capitol Company being issued to bear eight per cent., in the place of five per cent. interest, and providing that debentures issued at a rate of interest exceeding five per cent., shall be without a bonus of fully paid up shares, except with the consent in writing of Taylor and the Farwells; also extending the time of obtaining the signatures of Abner Taylor and Charles B. Farwell to the agreement of June 1, 1885, to the 1st day of November following. On October 28, 1885, Taylor and Charles B. Farwell executed a ratification of the signing for them and in their names by John V. Farwell of the agreement of June 1, 1885.

On September 28, 1886, a further supplement to the agreement of June 1, 1885, was made between the several parties to it, without, as it alleged, the knowledge of Babcock, whereby, after reciting that Taylor had caused 438,372 acres of land covered by the agreement of June 1, 1885, to be conveyed to Trustees for the Capitol Company, pursuant to the sixth

clause thereof, and that for so doing Taylor and the
Farwells are entitled, under the eighth clause of said
agreement, to have the 292,248 pounds credited
against shares allotted or to be allotted under said
agreement, and further reciting that Taylor and the
Farwells have requested the Company, out of the
50,000 shares remaining unallotted, in accordance
with clause 3, to allot to the persons named in a cer-
tain schedule, the number of shares set against their
names respectively, and to credit such shares as there-
inafter set forth, it was agreed that out of said sum
of 292,248 pounds to apply the sum of ten pounds per
share in full payment of 14,748 shares in the schedule
attached, and that such shares shall be credited on
the books of the company as fully paid up and shall
be held free of all liability for calls. It is then charged
that in virtue of said several agreements all the obli-
gations assumed by Taylor and the Farwells with re-
spect to interest on debentures under the agreement
of June 1, 1885, apply to all such debentures issued to
the maximum rate of eight per cent. interest; that on
February 1, 1888, Taylor and the Farwells executed
and presented to the Board of Directors of the Capi-
tol Company an agreement, which by a majority of
the Board was accepted by the entry of this minute
upon the records of the Company: "A supplement-
ary agreement varying clause 12 of original agree-
ment with the vendors, dated June 1, 1885, was sub-
mitted and signed." This agreement, after reciting
the making of the contract of June 1, 1885, and the
several supplements thereto, provides for the elimi-
nation of clause 12 and the substitution in its place
of a clause to the following effect: That Taylor and
the Farwells undertake that until the gross receipts
of the Company from the sale of cattle shall be suffi-
cient to pay the interest of such of the debentures as
shall from time to time be issued, they, or some of
them, will, on notification to them in writing, pay the
Company a sum sufficient to pay interest on debent-

ures in excess of such gross receipts, which sum
shall be held by the Company in trust or applied
forthwith by it in the payment of such interest. It is
then charged that the existence of the last recited
agreement was kept secret from the shareholders,
and never referred to in any subsequent report of the
Company; that Babcock never knew of it, and that
appellant was equally in the dark in relation to it,
until it came to light in the taking of depositions in
this cause in London in August, 1906; that in no
event is that agreement of any binding force, as it ·
was executed by the Company, if at all, without any
consideration.

The bill, after averring that Babcock, under the
agreements of September 19, 1885, and until Febru-
ary 15, 1888, was entitled to a one-eighth interest in
the Texas enterprise, sets forth the making of the so-
called syndicate agreement of the date last mentioned
between Taylor, the Farwells, John T. Chumasero,
the firm of John V. Farwell & Co., and Babcock. This
agreement is in substance, that the parties to it had
formed a syndicate for the erection of the Texas
State House, for which three million acres of Texas
land was to be received; that the majority of such
land had been deeded; that the Capitol Company had
been formed to exploit the project, by issuing a mill-
ion pounds of debentures and two million pounds of
stock; that the money for debentures and stock had
not been forthcoming, as expected, and that in con-
sequence John V. Farwell & Co. had been obliged to
advance large sums of money, and are still advancing
money to a very large amount. Therefore, in consid-
eration of such advances, both made and to be made
by the Farwell firm, until the time when the sum
necessary to complete the building of the State House
is raised, the parties jointly and severally agree to
give the firm of Farwell twenty-five per cent. of the
total issue of stock as soon as issued to the Capitol
Company, to hold the same as the sole property of
said firm, as a bonus for its advances. It is also

agreed that all charges in making sale of debentures, interest advanced thereon, all stock given as a bonus, with debentures, etc., shall be a charge upon the stock to be given the Farwell firm. It is then averred that at the time of the making of the syndicate agreement Babcock was in ignorance of the execution of the other agreements heretofore set forth, to which he was not a party, and especially that he was unaware of the making or existence of the agreement of February 1, 1888, and that he signed the syndicate agreement for the sole purpose of approving of the giving to the Farwell firm of the 25 per cent. of stock therein provided for.

On January 5, 1889, the State House having been completed, the land to be received therefor deeded, the cattle business established thereon, a further agreement was made between the parties to the syndicate contract to evidence their several proportionate shares in the property, etc., vested in the Capitol Company, as represented in the stock of the Company. Said agreement is in substance as follows: That the stock of the Capitol Company is about to be issued to the parties entitled to the same; that the parties composing the syndicate are entitled to the disposal of about 180,000 shares; that suits by E. E. Myers and S. E. Burke are pending against the syndicate, and certain matters in dispute with William N. Sturges remain unsettled; that the Farwell firm purchased 15,000 head of cattle for the syndicate at $30 per head, and has also advanced to the syndicate large sums of money; thereupon it was agreed between the Farwell firm and members of the syndicate that the remaining undisposed of shares of the Capitol Company shall be allotted as follows:

To Abner Taylor ............................................30,000
"  A. C. Babcock ..........................................15,000
"  John T. Chumasero.............................. 7,500
"  John V. Farwell .......................................33,750
"  Charles B. Farwell ...............................33,750

That the remaining unallotted shares, estimated at about 60,000, shall be issued to the Farwell firm; that the expenses of the Myers and Burke litigation and the judgments, if any, obtained, shall be paid by the members of the syndicate in proportion to their allotment of stock above set out, and agree to pay the Farwell firm for the 15,000 head of cattle above mentioned $450,000, with interest from January 1, 1889, at six per cent., the principal to be paid immediately upon the sale of the cattle. Gains and losses on sale of cattle to be shared and borne by the several parties in the porportion of their stock allotment aforesaid. The Farwell firm agree to pay all the debts of the syndicate incurred in building the State House, except certain debts enumerated, and all expense in sale of debentures, and to indemnify the syndicate against expense of settlement of Sturges' claims; that the Farwell firm are to have all the remaining unsold debentures belonging to the syndicate, as well as all lands belonging to the syndicate not deeded to the Capitol Company. It is then averred that not only was Babcock then unaware of the execution of the other agreements, to which he was not a party after the June 1, 1885, agreement, but that at the time of signing the distribution agreement last mentioned, the Farwells represented that the obligations of the vendors under the June 1, 1885, agreement remained as the same stood up to January 1, 1888. Besides the stock mentioned in the agreement of January 5, 1889, Taylor and the Farwells had received 600,000 pounds of the debentures of the Capitol Company under the agreement of June 1, 1885; that without the knowledge of Babcock and with the intent to secure to themselves the net earnings and the proceeds of the sale of cattle of the Company for the payment of debenture interests, Taylor and the Farwells on March 27, 1889, secured from the Company as lessors a lease to themselves as lessees of the Texas lands for the

term of five years, on the following terms and conditions: During the term the lessees to manage cattle on the lands, with power to sell steers over three years old, surplus cattle and fat cattle in their discretion, for the best prices, the lessees to care for and graze the cattle and maintain their number and the increase thereof, whether by nature or purchase, less sales made. The proceeds of sales to be used by lessees to recoup themselves for all rents and other moneys provided to be expended by them under "this" lease to the Company, less such sums sufficient to pay interest on debentures, London expenses and fixed charges of the Company. Lessees to pay the Company half yearly 15 cents for each acre properly watered to receive cattle, it being agreed that 2,500,000 acres are so watered, and that when more acres are watered, which lessees agree shall be done as soon as the increase of cattle shall require, to pay 15 cents an acre for such additional watered land. As additional rent lessees agree to pay five per cent. on the value of each head of cattle then on the lands, estimated at $19.50 per head, provided lessees shall have been fully recouped from sales as above provided. Lessees also agree to pay all rates and taxes imposed upon the lands by the taxing authorities of the State or underlying municipalities within the district where said lands are situate, as well as all current expenses of the ranch, including repairs to all buildings, fences, etc., thereon. Moneys received by lessees shall be disposed of as follows: In recouping lessees for rates, taxes and expenses paid under the terms of the lease. Any surplus from rentals agreed to be paid the Company after paying interest on debentures and London expenses shall be retained by lessees to recoup themselves for rentals paid the Company if they shall not have been previously recouped from the sale of lands. Any balance remaining after lessees are fully recouped as above directed, shall either be paid into the treasury of the Company or used in the improve-

ment of the ranch, as may thereafter be agreed. If money received from sale of cattle shall not be sufficient to recoup lessees as agreed at the end of the lease they shall be at liberty to make up the deficiency from the increase of the herd above 150,000 head, the cattle so taken to be selected and valued by arrangement between the Company and the lessees, the latter having no claim for recoupment against the Company otherwise than as agreed. Company to have right to terminate lease whenever lessees cease to own two-thirds of the Company's stock, and that the lease shall not operate to affect any existing agreements for the sale of land by the Company; provision for termination of lease and re-entry by Company for non-payment of rent, and that upon the termination of the lease the lessees will deliver to the Company 150,000 head of cattle of the same ages and classes as near as may be as the herd existing at the date of the lease.

It is further charged that the ranch was operated under said lease at a heavy loss, and figures are given in support of such charge, but that, notwithstanding such fact, at a meeting of the directors of the Company in London on July 29, 1892, a report was presented by the board showing a profit and reciting "that the amount due the American agency—the Farwells and Taylor—is entirely extinguished and the Company has no liabilities beyond those to the mortgage debenture holders; that the lessees report that there are now on the lands 150,000 head of stock, which they estimate to be worth from 400,000 to 500,000 pounds." That at said meeting a dividend of 2½ per cent. on 500,000 pounds of ordinary shares was declared and paid and participated in by Taylor and the Farwells; that Babcock received no part of that dividend; that thereby Taylor and the Farwells became estopped to claim that the Company was indebted to them for any sum paid under the lease to them; that as a matter of fact the Company was not

indebted to them, but on the contrary they were indebted to it in large sums of money.

On April 29, 1889, John V. Farwell being in England, Babcock, Chumasero and Taylor and Charles B. Farwell, made John V. Farwell their attorney in fact by a writing under seal to receive the stock of the Company due to each of them under the agreement of January 5, 1889; that John V. Farwell, contrary to his duty, wrongfully secured the issuance to himself or Charles B. Farwell, of the 15,000 shares due Babcock and refused on demand to deliver such stock to Babcock; that the Farwells claimed as reasons for not delivering the stock to Babcock that the Farwells had advanced large sums of money, which were a charge against the stock; that after many negotiations and demands made by Babcock in an effort to procure from the Farwells 15,000 shares of the Capitol Company claimed to be wrongfully withheld by them from him, an agreement of date November 7, 1889, was drafted between the Farwells and Taylor. The Farwells at this time endeavored to persuade Babcock to execute a like agreement, which he refused to do. After more futile negotiations in relation to said stock, on March 26, 1891, another agreement was prepared for execution by the Farwells, Taylor and Babcock, but Babcock refused to become a party to it. In the meantime and in January, 1890, Babcock for the first time learned of the March 27, 1889, lease. The Farwells falsely, as Babcock insisted, claimed that the Capitol Company was indebted to the Farwell firm nearly a million of dollars, and that Babcock's stock was liable for its proportion thereof; that after much effort to secure a settlement, which proved futile, on June 15, 1891, Babcock filed in the Circuit Court of Cook county his bill against the Farwells, Taylor and the Farwell firm, in an attempt to procure by decree in that cause a delivery of the 15,000 shares of the Capitol Company stock due him, and also an accounting for dividends and other mon-

eys due him, to which the Farwells interposed a cross bill, setting up counter-claims which they insisted were a lien on the stock of Babcock, etc.

Pending the litigation last recited a settlement of the matters in controversy between the Farwells, the firm of John V. Farwell & Co., Taylor and Babcock was arranged, and that litigation in faith of such settlement dismissed out of court. This agreement of settlement was evidenced by a writing under seal between the parties last named, bearing date January 30, 1896. The main provisions of this settlement agreement are as follows: It is recited that all matters in controversy and of difference between them, or any of them, are settled and adjusted as follows: 1st: That Babcock shall dismiss all pending litigation against any and all the parties mentioned. 2nd: That Babcock shall cause the other parties to be released from all obligation and liability under a creditor's bill filed by the First National Bank of Canton, Illinois, against him, the Farwells and Taylor. 3rd: "That the said Amos C. Babcock does hereby release and forever discharge all the other parties hereto from any and all claims and demands of every nature which he may have against all, any or either of the other parties hereto, except the delivery to his order of ten thousand ordinary shares and ten thousand deferred ordinary shares of the Capitol Freehold Land & Investment Company (Limited) of London, England, which have this day been assigned by the order of the said Amos C. Babcock to Wm. H. Parlin." 4th: Babcock waives any objection to any and all contracts entered into between the Land & Investment Company of the one part and the Farwells and Taylor of the other part, and assigns and releases to the Farwells any interest he may have therein. As a consideration for the foregoing the Farwells paid to Babcock fifteen thousand dollars. Charles B. Farwell at the request of Babcock assigned and delivered to Wm. H. Parlin ten thousand of the ordinary shares

and ten thousand of the deferred ordinary shares of the Land & Investment Company, and at the request of Parlin the same have been transmitted to the home office of the Company for transfer upon its books, and Farwell agrees promptly upon receipt thereof from the London office to deliver the new certificates to said Parlin. The parties of the second part release and forever discharge Babcock from all claims and demands of whatever kind, which they or any of them may have against him. The twenty thousand shares of stock mentioned in the settlement agreement was in accord therewith delivered to Parlin. At the direction of Babcock certain of such shares were delivered to Babcock's creditors in payment of his debts, and the balance thereof remained in the possession of Parlin until the death of Babcock, which took place February 25, 1899; that Babcock died testate and his will bequeathing all of his estate and property to appellant was duly proven and admitted to probate in Cook county, and all the shares of stock in the hands of Parlin at the time of Babcock's death were by Parlin, in accord with the directions of Babcock's will, assigned and delivered to appellant. This stock constitutes all the holdings of appellant in the Land & Investment Company, and is the stock in virtue of the ownership of which she predicates her right to the relief sought and prayed for in the bill as amended. It is sought to evade the effect of the settlement agreement because of the many frauds enumerated as practiced by the Farwells in procuring its execution by Babcock. That on July 9, 1901, appellant caused a request to be delivered to the Land & Investment Company, requesting it to take steps to annul the contract of July 12, 1884, under which the Farwells and Taylor were in possession of its property, and for an accounting from the syndicate; that the Company, not heeding such request, appellant, on July 23, 1901, filed a bill in the State of Texas seeking such relief, and after prosecuting the same

for several years, caused it to be dismissed on her own motion before final adjudication. Appellant avers that at the time of her husband's death she was of the age of sixty-six years and not familiar with business affairs, and that Babcock, at the time of making the settlement agreement, and for some time prior to his death, was in ill health and incompetent to transact business affairs. The Texas bill prayed for receivers of the Capitol Company property and receivers were appointed on an *ex parte* hearing without notice to any of the defendants in the bill and also prayed for an accounting against the Farwells and Taylor and for a sale of the Capitol Company property and a distribution ratably among the stockholders in proportion to their stock holdings, for the abrogation of the several lease contracts, etc. An appeal was prosecuted from the order appointing receivers to the Texas Supreme Court, and that order was by the Supreme Court annulled, and the receivers discharged.

The Farwells answered the bill in the Texas litigation and depositions of the officers of the Capitol Company were taken in London, on written interrogatories, that the cause was called for trial and after evidence had been given on the eighth day of April, 1902, it is alleged that appellant "being of advanced age and without means to prosecute said cause, and being then wholly ignorant of any grounds for assailing the said settlement of 1896, save those stated in said bill filed in Texas, and being unable because of the death of said A. C. Babcock to prove such allegations and being wholly ignorant of the false character of the representations and fraudulent transactions herein set forth, and not mentioned in said bill in Texas," dismissed the Texas bill. That appellant was induced to dismiss her said Texas bill in large part by the assertions and statements set out in the answers of the Farwells made under oath; that in the Texas litigation she was opposed by the Capitol Company when, as she claims, she should have had

its assistance; that in reply to requests and demands for assistance from said Capitol Company, being wrongfully led and controlled by J. V. Farwell, it stated to appellant "that there was no ground whatever for the various claims made in said statement and requests, and left your oratrix to take such course as your oratrix thinks fit." Appellant further alleges that she "has not been able, owing to said misrepresentations of said defendants, even to the present time, to fully ascertain the character and details of all of the acts of said defendants, and has only been able to secure and frame the facts herein set forth within the last few months." That appellant first applied to the counsel on the record in this cause about June 1, 1905, and then laid before them the record in the Texas suit and such papers as she had in relation thereto; that such counsel spent several months in examining such papers, and not until the fall of 1905 did they, from their investigation of such papers and from investigations made by her son, advise her, nor did she have reason to suspect, that the representations of the syndicate as to the Company's earnings to the year 1899, and the representations of the Farwells to Babcock as to the indebtedness of the Company, were untrue; that she did not ascertain the facts stated in the original bill earlier than six months before its filing, and that since its filing she learned of the following matters:

1.   The pretended contract of February 1, 1888, and the action of the Directors thereon.

2.   That no reference to the interest of Babcock appeared in the Company's records for 1885.

3.   That shortly after May 3, 1893, the Directors sent an accountant to America to facilitate the preparation of the yearly accounts.

4.   That the Directors resolved to take the opinion of counsel relative to the liability of the syndicate under the agreements of 1892.

5.   That by correspondence and cablegrams J. V.

Farwell first suggested and dictated the execution of the July 12, 1894, contract.

6. That on October 16, 1893, the Company's accountants made a report in writing, shown in the depositions, that the Company was not indebted to the syndicate, and that there were only 128,259 head of cattle on hand December 21, 1892, and a balance then due by the lessees of 38,693 pounds, 19s. 5d., with a statement that ''the actual sum expended in excess of receipts by the lessees appears to be 424,024 pounds, 3s.''

· It is further alleged that the Farwells have been residents of Illinois continuously since 1885, and that John V. and the representatives of Charles B. Farwell were such residents at the time the bill was filed; that the Capitol Company had its main land office in Chicago, and that practically all·its business was carried on in Chicago, under the supervision and direction of John V. Farwell; that all the money of which the Company has been deprived is represented by the liability of the defendants resident in Chicago; that the Farwells, appellant and other residents of Illinois, own about nine-tenths of all the Company's stock; that the incorporation of the Company in England, and the maintaining by it of offices there, are merely nominal; that the business· of the Company and its property interests and management are in fact located in and chiefly owned by citizens of the United States; ''that defendants have continuously since January, 1889, and are now continuing to carry on a fraudulent agreement and device for the sole benefit of the defendants other than said Company, and have never disclosed to your oratrix, or offered any means to your oratrix, or the other minority stockholders of said Company, of ascertaining the nature and character of the true state of said Company; and that your oratrix has, at great trouble and expense and many years of effort, secured the knowledge of the facts now known to her and herein set 'forth''; alleges that

the officers and directors of the Company are: John V. Farwell, Walter Farwell, an executor of the will of Charles B. Farwell, deceased, Frank Crisp, Jr., solicitor in England of the Company, George and William Findlay, employees of John V. Farwell, John Young, Chairman of the Company; that Crisp and Young are nominees and under the control of John V. Farwell, and that no action can be secured to be taken by such Directors against the Farwells; that the Farwells own and control more than two-thirds of the capital stock of the company, and it is therefore necessary that appellant and the other stockholders, similarly situate, be held, adjudged and authorized, for all the stockholders of said Company and in its right and behalf," to bring and maintain this bill of complaint; makes all the appellees defendants; after propounding twenty-four interrogatories to be answered by John V. Farwell, and two specific interrogatories to be answered by the executors of Charles B. Farwell, deceased—in addition to their answering as many of the preceding twenty-four as they are able— which interrogatories in the main call for information in support of the material averments of the bill as amended, prays *inter alia* that the contracts of July 29, 1892, February 1, 1888, July 29, 1892, and July 12, 1894, and all other contracts made by "defendants" with the Capitol Company whereby they or either of them claim the right to hold the profits and increase of ranches, improvements and cattle of the Capitol Company, may be adjudged to be invalid and unconscionable, and of no force or effect, and that defendants, other than the Company, be held to the liability of Trustees of the Company and be decreed to account for and pay to and turn over to the Company all of the cattle, lands, improvements and property received at any time under any of said contracts, together with all profits made thereon, including compensation for the use and enjoyment thereof as may be just and proper, and that John V. Farwell and the

Estate of Charles B. Farwell, deceased, may also be required to account for and pay to the Company the fair value of thirty thousand head of cattle, under the obligation of the lease of March 27, 1889, or such number of cattle which with those actually on the ranch January 1, 1890, shall make 150,000 head, and that they be required to account for and pay to the Company such amount as it may have paid upon interest on Company debentures of the one million pound issue mentioned in the agreement of June 1, 1885, where such interest was paid exclusive of the net cash profits of the Company and resulted in an impairment of its capital. That the amount so required to be repaid be held to be payable out of or off-set by net profits of the Company, and not out of capital, and such amount be held not to be a debt of the Company or payable otherwise than from net profits; that net profits be ascertained by deducting from the fair value of all the Company's property and its cash resources the par value of its capital stock and the principal of its unpaid debentures; that all the defendants be enjoined from paying any further interest on debentures except out of net cash profits or from money advanced by defendants, except the Company, and that the defendants, except the Company, be enjoined from asserting any claim for interest or principal on the debentures held by them, and from transferring the same until they have accounted with the Company as prayed; that John V. Farwell and the Estate of Charles B. Farwell be decreed to account to the Company for and surrender to it for cancellation all stock and debentures held by them or at any time received by them, representing or being the profit secured by them out of stocks and debentures acquired by them from Babcock or from Taylor, together with the money or claims to money "likewise so acquired;" that the last named defendants be further enjoined from using as their own the brands and good will of the Company, and

from advertising and holding themselves out as the owners of the lands, cattle and business, and that appellant and the other stockholders in their own right and in the right of and on behalf of the Company, may have general relief.

The appellees, the Farwells, filed general demurrers to the whole and special demurrers to specific parts of the bill as amended. These demurrers are elaborate and somewhat subtle and ingenious, but we refrain from here setting out their several sinuous and involved windings as non-essential to an understanding of their effect on the conclusions reached by us and the learned Chancellor of the Superior Court.

The Capitol Company interposed a special demurrer, assigning the following reasons, in substance, why appellant is not entitled to the relief prayed, viz: That nothing contained in her bill as amended entitles her to either discovery or relief against the Company, and that any discovery which the Company might make in relation to the matters charged could be of no avail or benefit to appellant, or entitle her to any relief touching said matters; that it appears from the amended bill that the same is exhibited against the Farwells for several distinct matters and causes, in many whereof, as appears heretofore, the Company is in no wise interested, and that by reason of such distinct matters the pleading is drawn out to a considerable length, and that by joining such distinct matters together, which do not depend on each other, the proceedings as the cause progresses will be intricate, and prolix, and the Company put to unnecessary charges and expense in matters which in no way relate to or concern it. On the hearing of all the demurrers they were sustained and a decree entered June 12, 1907, dismissing the bill as amended for want of equity.

KRAUS, ALSCHULER & HOLDEN, for appellant.

HORACE KENT TENNEY, M. LESTER COFFEEN and ROGER SHERMAN, for appellees; HORACE KENT TENNEY, of counsel.

MR. JUSTICE HOLDOM delivered the opinion of the court.

The errors assigned are encompassed within one ruling—the sustaining of the several demurrers and the dismissing of the bill as amended for want of equity. This one ruling, however, demands a searching of the whole pleading, in order that we may determine whether such ruling is erroneous or not. This demand has been fully met with painstaking care. The extensive briefs of the several counsel have received like scrutiny and consideration.

The bill as amended is unusual from the fact that it sets out very largely the evidential facts relied upon as justifying the granting of the relief sought and invites a demurrer to settle that question. Appellant's counsel say in the introductory part of their brief, "The amended bill as amended is intentionally so drawn as to challenge and invite the raising upon demurrer of the contentions that were advanced and ruled upon by the trial court, that laches and the bar of limitations precluded the appellant from obtaining relief as to some of the matters complained of." We may enlarge somewhat this admission by holding that the demurrers interposed sufficiently, in our opinion, present for decision, as matter of law, the right of appellant to relief as to any of the matters complained about in the bill as amended. We have concluded that the demurrers are well taken in law and that the bill as amended does not state a case entitling appellant to any of the relief prayed, and that the decree sustaining the demurrers and dismissing the bill as amended for want of equity is without error. The doctrine of laches, the statute of limitations, ratification of acts, now complained about, by the Company, the settlement contract between. the Farwells and Babcock of

January 30, 1896, the lack of power in appellant, in virtue of her stockholdings to attack the actions of the Company, its contracts and other dealings with the Farwells, or third parties, prior to her becoming such stockholder, the insufficiency of charges of acts and conduct of the Company subsequent to appellant's becoming a stockholder—are some of the insuperable barriers in the way of obtaining the relief prayed.

At the threshold of the cause we are confronted with the challenge that the Illinois courts have no jurisdiction to administer the relief sought, because the Capitol Company is a corporation existing in virtue of the statutes of the British Parliament. It is contended that the Illinois courts have no jurisdiction over the internal affairs of a foreign corporation or to adjudicate upon disputes between its stockholders in regard to the conduct of its affairs, or to entertain complaints against the corporate management, nor to construe the acts of Parliament under which the corporation was created, interpret its by-laws, construe the charter contract, so-called, of June 1, 1885, and those subsequently made in virtue of it; also for the added reason that the charter contract provides that questions and disputes arising under it shall be settled in England, under the English Arbitration Act. Acquiescence by the court in this contention would necessarily end this cause, without regard to any other of the many questions injected into it. We, however, refrain from deciding this contention, more as a matter of expediency than for any other reason, and because we regard other questions raised as controlling upon the merits of the case made by the pleadings and decisive of the rights of the parties in any jurisdiction to which the case might be taken. By retaining jurisdiction—against which appellant will hereafter be estopped to complain—the rights of the parties will be finally settled and the quarter century of litigation ended, as it is meet and right that it should be.

Appellant became a stockholder in the Company in

December, 1903, when Parlin, who held 15,196 shares of stock as Trustee for Babcock, under the settlement agreement assigned it to her. Appellant grounds her right to relief upon the right of the Company to demand the same relief for which she prays. She further predicates her right to such relief upon the fact of her stockholdings, for, lacking ownership of stock, she would have had no standing in court to demand relief. She would have been regarded as an intermeddler, unless she came into court in a representative capacity, which she did not. If Babcock were alive and seeking the relief prayed by appellant, if entitled to prevail it would not be in virtue of his right as a stockholder, but because of his rights under the several contracts attacked for fraud. Such rights, it is well settled, are personal to the defrauded party and are not assignable. The authorities to this effect are numerous. We will cite but two—Bell v. Johnson, 111 Ill. 374; Brock v. Rogers, 184 Mass. 545. And it is just as firmly settled that a stockholder cannot complain of corporate acts done prior to his becoming a stockholder, upon the theory that such acts do not affect such stockholder's rights, as he is presumed to have become a stockholder with knowledge of conditions existing at the time of purchase. Dimpfell v. O. & M. Ry. Co., 110 U. S. 209. The ruling in Brown v. De Young, 167 Ill. 549, would bar this suit even upon the theory that appellant succeeded to the rights of her deceased husband as a stockholder at the time of his death, because he must be held to have ratified both impliedly and expressly the transactions now sought to be attacked. Appellant did not take her stock by devolution of law, but by gift, which is equivalent to purchase. She took the stock subject to the ratification by the settlement agreement of the contracts now attacked, through and under the terms of which the stock of appellant was, with other shares, acquired by Parlin as trustee for her husband. The inherent difficulty in appellant's cause centers in the fact that

all the persons having personal knowledge of the transactions assailed by appellant are long since dead. She has had no assistance, at any time, of any persons having actual knowledge of the Capitol Company's affairs, or that of the "Syndicate" or the operations of the Farwells in the building of the Texas State capitol, or the managing of the ranches on the immense tract of land granted by the State of Texas as compensation for the construction of its capitol building. She had the aid of her son and her able counsel in searching through a mass of documents and writings of various kinds, covering a period of many years, to discover evidence upon which to bring an action to sustain a more or less well-grounded suspicion that Babcock had been dealt with unfairly. It is no marvel, therefore, that no cohesive, consistent, tangible cause for relief is presented, and that the attempt to attack the contracts, agreements and dealings of the Company and the Farwells and Taylor proves abortive, and the attempt to upset the contracts, dealings and understandings of the parties and the Company, treated as settled for many years past, must fail, and that all rights vested in faith of these dealings unchallenged for so long a time, cannot now be disturbed.

It appears from the averments of the bill as amended, that auditors annually examined the accounts and transactions of the Company both in this country and in England, as provided by its by-laws, that notices that the accounts were correct were sent to the stockholders as directed by the by-laws, five days previous to each annual meeting; that such reports were read at each meeting and approved by the stockholders; that such approval under the by-laws was conclusive as to the correctness of the accounts, unless errors were discovered within three months of their approval, and that after the lapse of that time they became conclusive and not open to attack. Among the matters shown by these annual accounts of the auditors and approved by the stockholders, were the leases of July

29, 1892, and July 12, 1894, containing the items of claims between the Company and the syndicate, which were cancelled on the Company's books, and the reduction in number of the cattle to be returned under the lease from 150,000 to 120,000 head. These were all certified to by the auditors in compliance with the by-laws. Consequently in force of these circumstances, under the by-laws, these accounts are conclusively settled and not the subject of attack, nor can they again be questioned. None of these transactions was challenged at any subsequent meeting of the stockholders. They had the same power to approve as to reject, and having approved them, such action is binding alike upon the stockholders and the Company, and likewise upon appellant. Hawes v. Oakland, 104 U. S. 450. Furthermore the charge that the Directors were imposed upon is inconsistent with the contention that they acted fraudulently, and in no event could the actions of the Company, acting consciously through the Directors be impeached, except for the fraud of the latter, and then not for constructive fraud, but for actual fraud. This is forcibly in point as to the lease of July 12, 1894, for the averment concerning it is, that the Directors approved it reluctantly, which at least implies that they acted discreetly and with due deliberation and circumspection.

Babcock was interested in the Texas land scheme from its inception. He was interested in the contract for constructing the "State House." His original contract required him to pay ratably, according to his proportionate interest in the scheme, the cost of building the "State House." This he failed to do; that he made no financial contribution toward exploiting the scheme is admitted. Still it fairly appears that he was an active participant in all that was done to forward the project, and it necessarily follows that he either had actual knowledge, or could have had such knowledge, so that constructively at least he is chargeable with knowledge of all the varied transactions by which

the enterprise was carried forward in all its many and at times involved stages. This knowledge extends to the actions of the Company and Directors in all matters shown by its records and involved in the contracts and agreements to which he was a party, and to all the matters entering into his settlement agreement and referred to in it. Aside from all other considerations, such knowledge not only bound Babcock, but is just as binding on all parties claiming under him as holders of stock given to Parlin as Trustee for Babcock, and we think Parlin must, by parity of reasoning, be held to have possessed all the knowledge imputable to Babcock.

Appellant has assumed contradictory positions in this litigation. In the Texas bill she asked that the lease of March 27, 1889, be set aside as fradulent, and claimed that the Company was guilty of fraud in not yielding to her demand by bringing suit to set it aside. In the case at bar she seeks to have the lease enforced as to the payment of rent and the number of cattle to be delivered by the syndicate to the Company at its expiration, but to avoid and cancel it as to the right to receive the benefits flowing to the other parties, and forming the consideration for its execution by them. Waiving the effect of the change of attitude by appellant, this lease cannot be so treated. It cannot be ratified in part and enforced in part. If rescinded at all, it must be as to the whole. To do the latter, the moving party must act promptly after discovering the fraud. Sleeping upon such claimed right will not be tolerated; and further, the party seeking rescission must restore the *status quo*. Neither of these has appellant done, and as to putting all parties in interest in *statu quo,* not only was it not done, but it is clearly not within the power of appellant to do. A failure promtly to disaffirm will be treated as an affirmance. There can be no partial rescission of a contract. If it is to stand at all, it does so in all its parts. Bollnow v. Novacek, 184 Ill. 463; Kellogg v. Turpie, 93 Ill. 265.

We cull and adopt from the brief of Mr. Munroe the fair and convincing summary of ultimate fact contained in it, and the doctrine of the law announced thereon as controlling:

"By the settlement contract of January 30, 1896, Mr. Babcock accepted $15,000 in money and 10,000 ordinary shares and 10,000 deferred ordinary shares from the Farwells in satisfaction of all his claims against the Farwells, Farwell & Co. and Mr. Taylor, and in consideration of this money and these shares, waived all objection he might have to every contract theretofore made between the Company and the Syndicate, and assigned and released to the Farwells all interest he had in every such contract. Mr. Babcock at the time of making that settlement contract knew of the June 1, 1885, contract, his assignment of September, 19, 1885, the lease of March 27, 1889, the contract of July 29, 1892, the draft agreement of February 6, 1894, which was the same in substance as the contract of July 12, 1894, and knew that the Farwells had extinguished the one-eighth Babcock interest in the Texas contract acquired by them by the assignment of September 19, 1885, and that the Company had issued the entire 199,993 shares of stock and 600,000 pounds of debentures to the members of the syndicate or their assignees. Upon this state of facts Mr. Babock was estopped, and appellant, as his successor in ownership of the stock now owned by her, is estopped, to claim that the Company has any equity as against the Farwells on account of the purchase from Babcock of his one-eighth interest in the Texas contract. The law is that a stockholder who has participated or aided in the issue of stock as paid-up stock for less than its par value, or in doing any voidable or illegal corporate act, or, having knowledge of such act, has ratified or acquiesced in it, is precluded from complaining of such act, is bound by it and cannot recede from it, and that an assignee of such a stockholder, even without knowledge of the irregular, voidable or illegal act or ratifi-

cation or acquiescence, stands in the shoes of the assignor, and is likewise bound.''

Many authorities are cited, from which we are content to cite these: Wells v. Northern Trust Co., 195 Ill. 288; Same v. Columbia Co., 75 Fed. Rep. 936; Clark v. American Coal Co., 86 Iowa 436; Barr v. N. Y., L. E. & W. Ry., 125 N. Y. 263.

Laches and the statute of limitations are clearly invocable as a bar to the aid of a court of equity, for the relief sought, and as the facts constituting such bar appear from the averments of the bill as amended, the demurrers filed are sufficient to present the whole subject for the judgment of the court. From what has already been said, knowledge of conditions, now sought to be impeached, is at least imputable to Babcock, whatever the fact may be as to actual knowledge on his part. No sufficient reason is alleged to excuse him from acquiring such knowledge. Neither could he, were he living, nor can appellant, escape the binding force of the mutual release of claims contained in the lease of July 12, 1894. This was twelve years prior to the filing of the bill in this case. Delays extending from at least twenty-one to ten years were suffered to intervene between claimed rights and the pursuing of a remedy to enforce them in this action. The statute of limitations, as well as laches, are, therefore, invocable as a complete defense. The Farwells purchased a half interest in Babcock's one-quarter interest in September, 1885, and the purchase in the settlement agreement occurred January 30, 1896, ante-dating the commencement of this suit twenty-one and ten years, respectively. Aside from the binding release in the settlement agreement the statute of limitations inhibits a disturbance of either. But it is urged with much force that the relationship of trustee existed, and consequently the statute of limitations and the doctrine of laches are equally inoperative to work an estoppel as to the *cestui qui trustent*. But this contention is clearly repugnant to the trend of authority. Babcock and the

Farwells in their several dealings were acting "at arm's length." Each was endeavoring to conserve the interest which was personal to himself. Each had knowledge, or at least equal means of knowledge, as to conditions. They must be and are equally bound by the terms of their written contracts. The trust, if any there was, from appellant's standpoint was one raised by presumption, based upon the relationship of the parties. But it is apparent that for many years Babcock repudiated the trust relationship, if any ever existed, long prior to the settlement agreement, and instituted in the Circuit Court of Cook county a bill in which he attacked all the transactions now sought to be avoided. During the trial of that cause the settlement agreement of January 30, 1896, was made. This settlement Babcock, who survived three years thereafter, never attacked. It remained for appellant to attack this settlement, which she did by her bill in the Texas forum, which she subsequently abandoned after an adverse decision of the Supreme Court of that state discharging the receivers which she had procured to be appointed on an *ex parte* application. Upon the hearing, after the reversal, which had not only discharged the receivers, but decided the question of laches and other questions affecting the merits adversely to appellant, on April 8, 1902, she dismissed her bill and then waited more than four years before filing the one at bar. Laches is likewise attributable to her for such long-continued delay, without lawful excuse, especially in view of the fact that the sole survivor of the persons who had actual knowledge of the transactions challenged was upwards of 80 years of age, and he has since paid the last penalty of life. The law presumes from such inexcusable delays, that the party seeking relief had some ulterior motive as an incentive, and that the purpose of such delay was to take an "undue advantage of evidence on one side, no longer capable of explanation on the other." Hammond v. Hopkins, 143 U. S. 224.

The statute of limitations and of laches are equally invocable as defenses where the trust has been repudiated, as in this case. In Benson v. Dempster, 183 Ill. 297, the court say: "When the trust relation is repudiated, or time and long absense has obscured the nature and character of the trust, or the acts of the parties or other circumstances give rise to presumptions unfavorable to its continuance, in all such cases a court of equity will refuse relief on the ground of lapse of time and its inability to do complete justice."

In Melins v. Pabst Brewing Co., 93 Wis. 153, the court say, after announcing a doctrine in accord with the last quotation, "and so, too, where the delay has been great, or the parties to, or witnesses familiar with, the transaction, as in this case, have died in the meantime." Penn v. Austin, 168 U. S. 685; Ushhursts Appeal, 60 Pa. St. 290; Fitch v. Miller, 200 Ill. 170; Clegg v. Edmondson, 8 D. E. G. Mac. & G. 756.

We think the case of Dempster v. Rosehill Cemetery, 206 Ill. 261, strongly analogous to the facts in the point now under discussion, and we therefore quote the language of the court which we regard as appropriate and forceful here, where the court say: "One important principle involved in the term laches is, that after a long lapse of years, during which testimony is impaired or destroyed, witnesses remove or die, their recollection is dimmed or lost and papers, letters, documents, books, records, etc., are lost or destroyed, or if not lost or destroyed, are in the hands of persons not familiar with their contents, liable to misinterpret them, unable to supply their defects or correct the same or explain them from the memory of living witnesses, the defendant is at the complete mercy of any claimants who may wish to take advantage of the situation. * * * A court of equity therefore finding itself unable to render substantial justice between the parties, asserts the principle of

Babcock v. Farwell, 146 App. 307.

laches on the ground of public policy and for the repose of property rights.''

The settlement agreement is binding upon all the parties to it. The release of Babcock and his ratification of actions done and contracts made and his assignment of all his interest in such contracts cannot be repudiated, now he is dead, by parties claiming stock obtained by Babcock as the price and consideration of that settlement. That settlement agreement was carried out in every particular in accord with its provisions and stipulations. The consideration of much value, moving to Babcock, consisting of twenty thousand shares of stock and fifteen thousand dollars in money, were paid and delivered. The suit pending in the Circuit Court, involving substantially the same matters projected into this suit, was dismissed as a part of such settlement. No tangible fact constituting in law or morals a fraud upon Babcock in obtaining the settlement agreement from him, is averred, nor is any such fraud fairly inferable from any other averment found in it. It bound Babcock; it binds appellant. As a settlement it raises a barrier to any further controversy in the forum of the law. Moreover, the money received by Babcock has been expended. Some of the shares other than those held by appellant have been parted with to creditors. Appellant is neither able nor does she offer to restore the *statu quo*. The attack on the settlement agreement, the attempt to avoid it, is in the nature of a rescission of it. No rescission of a contract can be procured without at least restoring the consideration parted with in virtue of its assumed validity and binding force.

There is no legal barrier preventing a majority of stockholders from voting into the directory of a corporation such persons as they may see fit. They have the right to put into the management of property, in which they have a controlling interest, persons who will, in their opinion, manage the corporation prop-

erty so as best to conserve it and their own interests. The Farwells were majority stockholders, and they made with the company contracts for their personal gain. In authorizing such contracts to be made, the Farwells took no part as representatives of the company; neither did they vote in the directors' meeting at which they were ordered to be entered into. However, the constitution of the company provided against such a condition being open to attack by declaring that a director might contract with the company, and that by disclosing that fact he should not be liable for any profit made under such a contract. There is neither impropriety nor violation of law in a director of a corporation entering into a contract with it, providing the corporation is represented by independent agents and the contract is otherwise without fraud. L. N. & A. C. Ry. v. Carson, 151 Ill. 444; Flynn v. Brooklyn Rd. Co., 158 N. Y. 493; S. W. Gas Co. v. Fuel Gas Co., 148 Pa. St. 13; McCloskey v. Snowden, 212 *ibid.* 249.

The contention that the contract of July 12, 1894, was strictly of a personal nature for personal service, and terminated upon the death of Taylor and Charles B. Farwell, is not well taken. The question of its personal characteristic must be solved by ascertaining from the contract itself the intent of the parties to it. Smith v. Preston, 170 Ill. 179. A reading of its several provisions impresses us with the conviction that it is in its essence and main features a lease of the ranches and the cattle on them of the company, for a term of years. That personal service necessarily followed in the care of the ranches and cattle under the covenants of the contract may be admitted; but it no more calls for strict personal service than does the covenant in a farm lease to rotate crops and till the land in a husband-like manner.

The decision of the Supreme Court of Texas in Farwell v. Babcock, 27 Texas C. A. 162, involved the merits of appellant's claim. That court held, as we

do here, that the contract of July 12, 1894, as well as the other contracts, were, if voidable, not void; that the settlement agreement of January 30, 1896, was a bar to a recovery, and that the allegations of fraud in connection with the latter were impotent to affect its validity, and that appellant not being a stockholder at the time the contracts were made, could not maintain an action to avoid them. With this decision before them, the directors of the company were justified in refusing appellant's demands to prosecute a suit for the relief here sought by appellant in its name and behalf. It was a matter for the exercise of the sound discretion of the directors as to whether they would embark in litigation of such magnitude and necessarily involving much cost, with such tangible evidence before them of probable failure. It was evidently the part of wisdom for the directors to refuse to accede to these demands of appellant. Such refusal must be fraudulent in order to permit of a stockholder bringing a suit in his name. Coquard v. National Linseed Oil Co., 171 Ill. 480.

Appellant has no right to relief in any event, other than for malconduct since she became a stockholder of the company as provided in the by-laws which occurs when the name of the owner of stock is entered on the "register of members." No specific charge of fraud or malconduct on the part of the directors or the Farwells is made in the bill as amended since appellant became such stockholder. Appellant has no standing in a court of conscience to disturb the contracts and dealings of the company or the Farwells in relation to the matters about which they contracted and dealt as set forth in the bill as amended, for the reasons already given. The demurrers therefore were sustained, as they should have been, and the decree of the Superior Court dismissing the bill as amended for want of equity is affirmed.

*Affirmed.*